Filed 8/29/16  Corman v. Corman CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROGER M. CORMAN, et al.,<br><br>  Plaintiffs and Appellants,<br><br>  v.<br><br>ROGER W. CORMAN, et al.,<br>as Trustees, etc.,<br><br>  Defendants and Respondents. | B251513<br><br>(Los Angeles County<br>Super. Ct. No. SP007923) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Reva Goetz, Judge.  Affirmed in part, reversed in part, and remanded.

Greines, Martin, Stein & Richland, Irving H. Greines, Robin Meadow and Marc J. Poster for Plaintiffs and Appellants.

Klapach & Klapach and Joseph S. Klapach for Defendants and Respondents Roger W. Corman and Julie Corman.

Carico Johnson Toomey, David Carico, Christopher D. Carico and Golnaz Yazdchi for Defendant and Respondent Guardian ad Litem.

_____

# INTRODUCTION

For the benefit of their four children, Roger W. and Julie Corman set up three irrevocable trusts: the Pacific Trust, the Tessa Trust, and the MG Trust. The children are now adults, and the trusts' assets are purportedly worth more than $100 million. In 2009 two of the Cormans' children, Roger M. and Brian, filed petitions in the probate court seeking, among other things, accountings for the trusts, distributions Roger M. and Brian claimed were due, removal of Roger W. and Julie as trustees, and disgorgement of allegedly misappropriated trust assets.

Four years later, after the conclusion of a trial on the petitions and on Roger M.'s and Brian's objections to the trust accountings, the probate court found that Roger W. and Julie had proved the accuracy of their accountings, Roger M. and Brian had failed to prove any malfeasance or improper accounting, and Roger M. and Brian had contested the accountings without reasonable cause and in bad faith. The court also found that distribution provisions in the MG Trust were ambiguous and should be reformed to reflect the original intent of Roger W. and Julie, which, the court found, was that those distributions occur only after the death of both Roger W. and Julie. The court therefore denied Roger M. and Brian any recovery on the petitions, reformed the terms of the MG Trust, and ordered Roger M. and Brian to pay from their shares of the Pacific Trust almost $3 million in attorneys' fees and costs the trustees had incurred to defend against Roger M. and Brian's petitions and objections.

Roger M. and Brian argue that the probate court made five prejudicial errors: (1) finding Roger W. and Julie did not breach their fiduciary duties as trustees, (2) recognizing and giving preclusive effect to a judgment from a court in the British Virgin Islands (BVI) declaring that Roger W. was the sole beneficial owner of certain foreign assets Roger M. and Brian contended belong to the Pacific Trust and the Tessa Trust, (3) reforming the MG Trust, (4) limiting the scope of the proceedings to the years 2004 through 2010, and (5) awarding attorneys' fees against Roger M.'s and Brian's shares in the Pacific Trust. We conclude that the probate court erred in finding that

Roger W. did not breach his fiduciary duty as trustee of the Pacific Trust, and we remand for a determination on whether his liability for the breach should be excused under Probate Code section 16440, subdivision (b).[1]  We also conclude that the probate court erred in reforming the MG Trust and in awarding attorneys' fees against Roger M.'s and Brian's shares of the Pacific Trust.  In all other respects, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     *The Trusts*

Roger W. and Julie Corman have four children:  Catherine (born 1975), Roger M. (born 1976), Brian (born 1977), and Mary (born 1984).  They created three irrevocable trusts for their children:  The Pacific Trust created in 1978, the Tessa Trust created in December 1987,[2] and the MG Trust created in 1993.  This protracted probate litigation involved all three trusts.

#### 1.     *The Pacific Trust*

The Pacific Trust designates Roger W. as trustee, and the Corman children and their issue as beneficiaries.  The trust provides for the distribution of each child's share of the principal and accumulated income after the death of both Roger W. and Julie as follows:  one-third 25 years after the inception of the trust, one-half the remaining balance 30 years after the inception of the trust, and the remaining balance 35 years after the inception of the trust.  The trust gives Julie and Bank of America, as "special trustees," the discretionary power to make distributions from principal and accumulated income during the lifetimes of Roger W. and Julie for the necessities of life and for luxuries "appropriate to the [children's] station in life."

---

[1]     Undesignated statutory references are to the Probate Code.

[2]     The month has statutory significance.

As trustee, Roger W. has the power to manage, control, and invest trust assets. The trust provides: "The enumeration of certain powers of the Trustee shall not limit its general powers, the Trustee subject always to discharge of its fiduciary obligations, being vested with and having all rights, powers and privileges which an absolute owner of the same property would have; provided, however, that the Trustor [i.e., Roger W.] shall not have the power to purchase, exchange or otherwise deal with or dispose of the principal or the income of the trust estate for less than a full and adequate consideration." The trust also provides that "[n]o liability of any nature whatsoever shall accrue to [the Trustee], for his actions as Trustee, except for fraud or dishonesty on his part, and each beneficiary . . . by accepting benefits received shall be deemed to have agreed to indemnify and hold the said Trustee harmless from claims or liability for matters arising by reason of his actions as such Trustee, except for fraud or dishonesty on his part."

The Pacific Trust began with $600,000 of Roger W.'s separate property and increased in value to as much as $80 million. This increase resulted, in significant part, from Roger W.'s and Julie's success in the film industry. They produced 168 films for the Pacific Trust, many (if not all) of which they distributed through their company Concorde-New Horizons.[3]

### 2. *The Tessa Trust*

The Tessa Trust names Julie as trustee, Roger W. as special trustee, and the Corman children and their descendants as beneficiaries. The trust directs the trustee to add the income of each child's share of the trust to the principal until the child reaches the age of 21, and thereafter to pay the income to the child, except as the special trustee in his discretion may direct the trustee to withhold. The trust gives the special trustee sole discretionary power to direct the trustee to make other distributions necessary for the

---

[3]    This company eventually changed its name to New Horizons Picture Corporation. We will refer to it as Concorde-New Horizons or C-NH.

children's support and maintenance in the manner of living to which they have become accustomed. After the death of both Roger W. and Julie, the successor trustee is to distribute to each child his or her share of the principal and accumulated income in fractions as each child reaches the ages of 25, 30, 35, 45, and 55.

The Tessa Trust gives Julie, as trustee, the power to manage, control, and invest trust assets, and provides that "the Trustors [i.e., Roger W. and Julie] shall not have the power to purchase, exchange or otherwise deal with or dispose of the principal or the income of the trust estate for less than an adequate and full consideration in money or money's worth." The trust exculpates the trustee from any liability for her actions as trustee, except for fraud or dishonesty, through a provision identical to the one in the Pacific Trust.

The Tessa Trust began with a cash transfer from Roger W. and Julie of $59,723. Roger M. and Brian claim that the Tessa Trust assets have grown to more than $8 million. As with the Pacific Trust, this growth resulted in large part from Roger W.'s and Julie's work in the film industry, including from films they produced for the Tessa Trust and distributed through Concorde-New Horizons.

### 3. *The MG Trust*

The co-trustees of the MG Trust are Roger W. and Julie, and their children are the beneficiaries. Section 2.1.1 of the trust provides that all trust income will be added to the principal during the lifetime of the survivor of Roger W. and Julie, that upon the death of that survivor the trustee may distribute to any child as much of the income and principal of that child's share as the trustee in his or her discretion may deem necessary, and that any trust income not so distributed will be added to the principal. Section 2.1.2 provides that the trustees are to distribute fractional amounts of the principal of a child's share as the child reaches the ages of 30, 35, 40, and 50, and that, if at any time after a child reaches the age of 25 the undistributed balance of his share of the trust is less than $10,000, the trustees are to distribute that balance to him or her. Section 2.1.2 is silent

5

regarding whether the distributions it describes may occur while either Roger W. or Julie is living, or whether they may only occur after both have died.

The principal asset of the MG Trust is a 99 percent limited partnership interest in the Corman Family Investment Partnership, of which Roger W. and Julie own a 1 percent general partnership interest. The partnership owns an office building, part of which it leases to Concorde-New Horizons.

B.     *The Petitions and the Mistrial*

In 2009 Roger M. and Brian filed petitions concerning each of the three trusts. The petitions sought, among other things, accountings of the trusts, removal or suspension of Roger W. and Julie as trustees, immediate distribution of the MG Trust's assets in accordance with section 2.1.2 of that trust, and a surcharge against the trustees for, and disgorgement of, misappropriated trust assets. The petitions alleged that Roger W. and Julie abused their discretion and breached their fiduciary duties as trustees and special trustees by, among other things, refusing to provide Roger M. and Brian with accountings, ceasing to make distributions to them and firing them from the family business in retaliation for having requested accountings, borrowing trust funds at inadequate interest rates, depleting trust assets, and failing to make required distributions from the MG Trust. Roger M. and Brian also alleged that Bank of America breached its duties as special trustee of the Pacific Trust by, among other things, facilitating the alleged malfeasance by Roger W. and Julie.

Judge Craig Karlan, who initially conducted the proceedings regarding the petitions, appointed counsel to serve as guardian ad litem for the trusts' unborn beneficiaries. Judge Karlan also ordered Roger W. and Julie to prepare accountings for the trusts from 2004 to 2010. Judge Karlan denied an application by the guardian ad litem asking the court to exercise jurisdiction over and, in effect, freeze certain assets in the BVI that were the subject of allegations in Roger M. and Brian's petitions and whose ownership was disputed between Roger M. and Brian, on the one hand, and Roger W. and Julie, on the other hand. Judge Karlan, however, did suspend Roger W.'s powers as

6

trustee of the Pacific Trust regarding the Pacific Trust's potential ownership interests in the disputed BVI assets, and appointed Margaret Lodise to exercise those powers as temporary trustee. Lodise's authority included the power to prosecute and defend claims, and otherwise participate in legal actions, in the BVI on behalf of the Pacific Trust.

In October 2011 Roger M. and Brian filed objections to the trust accountings submitted by Roger W. and Julie.[4] In July and August 2012 Judge Joseph Biderman conducted a trial on the petitions and the objections to the accountings. Before issuing a final decision, however, Judge Biderman disqualified himself from any further proceedings and declared a mistrial. The court assigned the matter to Judge Reva Goetz for retrial.

C. *The Second Trial*

Beginning in July 2013 the parties again tried Roger M. and Brian's petitions and objections, along with a new petition they had filed seeking an order declaring that any interest held by Roger W. and Julie in the assets or shares of Pasig, Ltd., a BVI entity, they held as trustees of the Pacific and Tessa Trusts. On the first day of trial, the court dismissed the new petition as moot, recognizing under the doctrine of comity a June 2013 judgment rendered by the "Eastern Caribbean Supreme Court[,] Territory of the [British] Virgin Islands" (the BVI court), which ruled that Roger W. was the true beneficial owner of Pasig and its assets. The court ruled that the judgment by the BVI court barred the new petition concerning Pasig under the doctrine of res judicata. The court also determined that the trial on the remaining petitions would concern only the period for which the court had ordered trust accountings, i.e., 2004 to 2010, and the court denied requests by Roger M. and Brian for additional accountings going back to the inception of the trusts.

---

[4] The guardian ad litem also filed objections to the accountings. In July 2012, however, the guardian ad litem settled his claims against Roger W. and Julie and withdrew his objections.

7

During the trial, the court heard testimony by Roger W., Julie, Roger M., and Brian. The court also heard testimony by Lester Schwartz, a certified public accountant called by Roger M. and Brian; Frances Marshall, a manager of trust officers at Bank of America; Thomas Krentzin, an accountant with Concorde-New Horizons; Jeffrey Cannon, a certified public accountant called by Roger W. and Julie; and Bruce Macdonald, an attorney with certified legal specialties in estate planning, trust and probate law, and taxation law, who was called by the guardian ad litem.

At the conclusion of trial, the court found that Roger W. and Julie had met their burden of proving the accuracy of their accountings for the three trusts, Roger M. and Brian had failed to introduce any evidence of malfeasance or improper accounting by any trustee, and Roger M. and Brian had contested the accountings without reasonable cause and in bad faith. The court also found that there was a latent ambiguity in the distribution provisions of the MG Trust and that they did not express the original intent of the settlors, Roger W. and Julie. The court found that Roger W. and Julie intended the children to receive fractional shares of the MG Trust principal only after Roger W. and Julie died, and that the court should reform the trust to reflect that intent.

On December 3, 2013 the court entered judgment, ordering that Roger M. and Brian recover nothing on their petitions, approving the accountings submitted by Roger W. and Julie, and reforming the MG Trust to provide for distribution of the children's fractional shares of the principal only after the death of both Roger W. and Julie. The court awarded attorneys' fees and costs to Roger W. in the amount of $816,732.68, Julie in the amount of $779,582.97, the guardian ad litem in the amount of $887,860.46, and Bank of America in the amount of $506,993.81, all payable from Roger M.'s and Brian's shares of the Pacific Trust. Roger M. and Brian timely appealed.

8

**DISCUSSION**

Roger M. and Brian challenge five of the probate court's rulings. First, they argue substantial evidence does not support the court's finding that Roger W. and Julie did not breach their fiduciary duties as trustees of the Pacific Trust. Second, they contend the court erred by recognizing under the doctrine of comity, and giving preclusive effect to, the BVI court's decision. Third, they assert the court erred by reforming the MG Trust. Fourth, they argue the court abused its discretion in limiting the trust accountings and the evidence at trial concerning alleged breaches of fiduciary duty to the years 2004 through 2010. Finally, they contend the court erred by awarding attorneys' fees against their respective shares of the Pacific Trust based on the finding that they contested the trust accountings without reasonable cause and in bad faith. We agree with Roger M. and Brian's odd-numbered contentions: the first, third, and fifth.

A. *The Probate Court Erred in Finding That Roger W. Did Not Breach His Fiduciary Duty as Trustee of the Pacific Trust*

Roger M. and Brian claim two breaches of fiduciary duty by Roger W. and Julie as trustees of the Pacific Trust: (1) Roger W.'s withdrawal of more than $1.3 million from the trust to repay a gift he claims he made by mistake, and (2) Roger W. and Julie's acquisition from the Pacific Trust of stock in Concorde-New Horizons. Roger M. and Brian argue that the probate court erroneously concluded these acts were not breaches of fiduciary duty.

On appeal from a trial court's decision after a court trial, we review questions of law de novo and findings of fact, express or implied, for substantial evidence. (*M & F Fishing, Inc. v. Sea-Pac Ins. Mangers, Inc.* (2012) 202 Cal.App.4th 1509, 1519, fn. 12; *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 513.) "'However, where . . . the facts are undisputed, the issue is one of law and the appellate court is free to reach its own legal conclusion from such facts.'" (*Gallup v. Board of Trustees* (1996) 41 Cal.App.4th 1571, 1582; see *Taxpayers for Livable Communities v. City of Malibu*

9

(2005) 126 Cal.App.4th 1123, 1126 ["[w]e independently review all legal questions and those questions that rest on undisputed facts"]; *Lynch v. John M. Redfield Foundation* (1970) 9 Cal.App.3d 293, 297 [whether the defendants breached duty of trust presented a question of law on appeal because relevant facts were undisputed].)

1.      *The Duty of Loyalty*

Although Roger M. and Brian do not identify the specific fiduciary duty they claim Roger W. and Julie breached, their arguments concern the duty of loyalty. "The duty of loyalty, requiring a trustee to administer the trust solely in the interest of the beneficiaries . . . is the most fundamental duty of a trustee." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 905 (*Uzyel*); see § 16002, subd. (a) ["trustee has a duty to administer the trust solely in the interest of the beneficiaries"].)  A trustee violates this duty when, without the authorization of the trust instrument, permission by the court, or the consent of the beneficiaries, the trustee engages in self-dealing or any other transaction "in which the trustee's personal interests may conflict with those of the beneficiaries." (*Uzyel*, at p. 905; see § 16004, subd. (a) ["[t]he trustee has a duty not to use or deal with trust property for the trustee's own profit or for any other purpose unconnected with the trust, nor to take part in any transaction in which the trustee has an interest adverse to the beneficiary"]; Rest.3d Trusts, § 78 ["[e]xcept in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests"]; *id.*, § 78, com. d [describing self-dealing as "engaging on behalf of the trust in transactions with the trustee personally"].)[5]

---

[5]      "Consistently with section 15002, California courts have considered the Restatement of Trusts in interpreting California trust law." (*In re Estate of Giraldin* (2012) 55 Cal.4th 1058, 1072; see § 15002 ["[e]xcept to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state"].)

"It is no defense that the trustee acted in good faith, that the terms of the transaction were fair, or that the trust suffered no loss or the trustee received no profit. This is known as the no further inquiry rule. [Citations.] Such a transaction is voidable at the election of the beneficiaries, and other remedies may be available . . . ." (*Uzyel*, *supra*, 188 Cal.App.4th at p. 906.) These other remedies include compelling the trustee "to redress a breach of trust by payment of money or otherwise" and "trac[ing] trust property that has been wrongfully disposed of and recover[ing] the property or its proceeds." (§ 16420, subds. (a)(3), (a)(9); see Cal. Law Revision Com. com., foll. § 16420 ["reference to payment of money in paragraph (3) is comprehensive and includes liability that might be characterized as damages, restitution, or surcharge"].)

### 2. *Roger W. Breached His Duty of Loyalty by Withdrawing More Than $1.3 Million To Repay a Gift He Claims He Made by Mistake*

#### a. *Relevant Proceedings*

At trial Roger M. and Brian objected to an item in the Pacific Trust accounting that showed a transfer of $1,314,642.43 to Roger W. and Julie in 2009. In response Roger W. testified that the transfer was the return, with 2 percent interest, of a $1.3 million inheritance from his father that he (Roger W.) had disclaimed and deposited into the Pacific Trust sometime in the 1990s. Roger W. stated that he disclaimed and deposited the $1.3 million into the trust because he believed he would avoid gift taxes by doing so, that in 2002 he learned from his accountant that he was mistaken in believing this maneuver would avoid gift taxes, and that in 2009 he withdrew the $1.3 million and, on the advice of his accountant, charged 2 percent interest to avoid having the taxing authorities characterize the deposit as a gift. Asked why he waited seven years to withdraw the funds after learning of his mistake, Roger W. testified, "Frankly, I hoped the problem would go away," although he could not say why he thought it would go away.

11

The probate court found Roger W.'s explanation satisfactory. The court found "that while there is no evidence of 'self-dealing' and . . . the Pacific Trust benefited from earnings far in excess of the 2% simple interest that was withdrawn with this sum, Roger W. should not have withdrawn the 2% simple interest." The court stated that Roger W.'s withdrawal of the 2 percent interest, however, did not rise to a breach of fiduciary duty, and noted that "Roger W. realized profits of over 430% on an annual basis over the long life of the trust." Exercising its discretion under section 16440, subdivision (b),[6] the court found "that Roger W. acted reasonably and in good faith under the circumstances as known to him and is excused from any liability related to his withdrawal of the interest related to this sum."

The probate court also found, with respect to all the alleged breaches of fiduciary duty arising from the Pacific Trust, that the evidence was "insufficient to establish that the Trustee committed any act of fraud or dishonesty." The court stated: "Pursuant to the exculpatory clause of [the] Pacific Trust, the Trustee is not liable for any matters arising from his actions as Trustee."

> b.     *The Breach*

Roger M. and Brian argue that the probate court erred in finding that Roger W. did not engage in unauthorized self-dealing or otherwise breach his duty of loyalty when he withdrew the $1.3 million plus 2 percent interest. They argue that the uncontroverted facts—that Roger W. transferred this money from the Pacific Trust to himself without any consideration—establish as a matter of law that Roger W. breached his duty of

---

[6]     Section 16440 provides: "(a) If the trustee commits a breach of trust, the trustee is chargeable with any of the following that is appropriate under the circumstances: [¶] (1) Any loss or depreciation in value of the trust estate resulting from the breach of trust, with interest. [¶] (2) Any profit made by the trustee through the breach of trust, with interest. [¶] (3) Any profit that would have accrued to the trust estate if the loss of profit is the result of the breach of trust. [¶] (b) If the trustee has acted reasonably and in good faith under the circumstances as known to the trustee, the court, in its discretion, may excuse the trustee in whole or in part from liability under subdivision (a) if it would be equitable to do so."

12

loyalty. As they put it: "A trustee's taking of $1.3 million from the trust for his own use is the epitome of 'self-dealing.'" They ask us to direct the probate court to order Roger W. to disgorge and return to the Pacific Trust the $1.3 million and 2 percent interest he withdrew.

Roger W. and Julie make three arguments in response to this claim. First, they contend that Roger M. and Brian's argument ignores an implied finding, supported by substantial evidence, that Roger W. originally gave the $1.3 million to the trust based on a mistake. Roger W. and Julie argue that a mistake "negates the donative intent, and, '[w]ithout such intent, no gift ha[s] been made'" (quoting *In re Marriage of Jacobs* (1982) 128 Cal.App.3d 273, 285). Because, according to Roger W. and Julie, the $1.3 million never actually belonged to the trust, Roger W. did not engage in self-dealing or breach his duty of loyalty by taking trust property for his personal use when he withdrew the $1.3 million. In short, they contend, "Roger [W.] did not withdraw *trust* property."

Roger W. and Julie construe the duty of loyalty too narrowly. It does not matter that the probate court may have implicitly determined that the $1.3 million was never "trust property." The duty of loyalty requires the trustee not only to avoid taking trust property for his or her personal use, but also to avoid "tak[ing] part in any transaction in which the trustee has an interest adverse to the beneficiary." (§ 16004, subd. (a).) Roger W. did exactly the latter when he transferred the $1.3 million and 2 percent interest from the Pacific Trust to himself: regardless of the validity of his claim to that money, the beneficiaries had an interest in contesting that claim and keeping the money where it was. As Roger M. and Brian correctly argue, even if their father had made a mistake in depositing the $1.3 million in the Pacific Trust all those years ago, an "objective trustee" would have opposed Roger W.'s withdrawal on the ground, among others, that the three-year limitation period for seeking relief from a mistake had run.

13

Second, Roger W. and Julie note the probate court concluded that, pursuant to the Pacific Trust's exculpatory clause, Roger W. was not liable for any matters arising from his actions as trustee because there was insufficient evidence he engaged in fraud or dishonesty. Roger W. and Julie argue that substantial evidence supports the court's finding that Roger W. did not engage in fraud or dishonesty in withdrawing the $1.3 million plus interest.

The court erred, however, in determining that the exculpatory clause relieved Roger W. of liability for withdrawing the $1.3 million plus interest. The Probate Code provides that, with certain exceptions, a trustee "can be relieved of liability for breach of trust by provisions in the trust instrument." (§ 16461, subd. (a).) One of the exceptions, however, is that "[a] provision in the trust instrument is not effective to relieve the trustee of liability . . . for any profit that the trustee derives from a breach of trust." (§ 16461, subd. (b); see Cal. Law Revision Com. com., foll. § 16461 ["it is against public policy to attempt to eliminate liability for profits derived from a breach of a duty that the trustee does have"]; see also *Demoulas v. Demoulas Super Markets, Inc.* (1997) 424 Mass. 501, 515 [exculpatory provision in trust instrument will not be enforced "to relieve a trustee of liability for any profit that the trustee has derived from a breach of trust"].) As discussed, undisputed evidence established that Roger W. breached the duty of loyalty by transferring from the trust to himself the $1.3 million plus interest. Under the Probate Code, the trust's exculpatory clause cannot relieve him of liability for the profit—the $1.3 million with interest—he derived from that transfer. (See *Lozada v. City and County of San Francisco* (2006) 145 Cal.App.4th 1139, 1149 [interpretation of statute and its application to undisputed facts are questions of law].)

Third, Roger W. and Julie note that, even though the probate court found Roger W. should not have charged 2 percent interest on the $1.3 million he withdrew, the court exercised its discretion under section 16440, subdivision (b), not to impose liability for that mistake because Roger W. acted reasonably and in good faith under the circumstances. They observe that we review the court's decision not to impose liability under section 16440, subdivision (b), for abuse of discretion, and that we apply the

14

substantial evidence standard in reviewing the factual findings underlying that ruling, such as the finding of good faith. (Cf. *Uzyel*, *supra*, 188 Cal.App.4th at p. 911.) They argue that substantial evidence supports the court's finding of reasonableness and good faith, and thus the court properly exercised its discretion not to impose liability for the 2 percent interest Roger W. withdrew. Moreover, Roger W. and Julie contend that, even if the court erred in finding Roger W. did not breach his fiduciary duty by withdrawing the original $1.3 million, that error was not prejudicial because the court probably would have excused liability for that mistake also under section 16440, subdivision (b). They argue that if Roger W. "was not faulted for taking trust property (2% interest)," then "he also would not have been faulted for taking his own property (the $1.3 million)."

The probate court's exercise of discretion under section 16440, subdivision (b), however, was informed by two legal errors: a determination that Roger W. did not breach the duty of loyalty in withdrawing the $1.3 million or the 2 percent interest, and a determination that, pursuant to the trust's exculpatory clause, Roger W. was not liable for any matters arising from his acts as trustee, including his withdrawal of the $1.3 million plus interest. As a result of these errors, the court exercised its discretion to excuse Roger W. from liability for an amount much lower than that for which he was actually liable. A trial court decision that rests on legal error is an abuse of discretion. (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 590.) Because the equities of excusing Roger W.'s liability for more than $1.3 million are different from those that led the probate court to excuse his liability for the 2 percent interest (which amounted to less than $15,000), the probate court's determination to excuse Roger W.'s liability under section 16440, subdivision (b), cannot stand. Therefore, we remand for a determination of whether Roger W.'s liability for withdrawing the $1.3 million with 2 percent interest should be excused under section 16440, subdivision (b).

15

3. *Roger M. and Brian Failed To Establish that Roger W. and Julie Breached Their Duty of Loyalty by Acquiring the Pacific Trust's Stock in Concorde-New Horizons*

a. *Relevant Proceedings*

Concorde-New Horizons is a company that distributes films owned by the Pacific Trust and the Tessa Trust. At one time Roger W. and Julie owned all the preferred shares of stock in C-NH, and the Pacific Trust owned the common shares. Roger W.'s accounting for the Pacific Trust indicated that the trust sold its C-NH stock in 2005. At trial Brian objected to this item in the Pacific Trust accounting because the account summary for 2005 did not appear to accurately summarize the account entries that purportedly reflected the sale. Roger M. testified that he believed the Pacific Trust accounting was incomplete because it did not show the trust's ownership interest in C-NH. For their part, Roger W. and Julie presented evidence that in 2005 both they and the Pacific Trust sold their C-NH stock to the Transpacific Corporation, a transaction that in effect transferred ownership of all C-NH stock to Roger W. and Julie.[7] At the conclusion of trial, Roger M. and Brian again objected to the Pacific Trust accounting with respect to the purported sale, arguing that "we don't have any sales documents or other evidence of the so-called transfer," and on this basis they asked the court "to rule that Concorde-New Horizons belongs to the Pacific Trust."

In its statement of decision, the probate court found that the Pacific Trust accounts were accurate. The court noted Roger M.'s "belie[f]" that the accounting failed to report C-NH as an asset, and stated: "C-NH is owned by Roger W. and Julie. They purchased it in 2005 from Pacific Trust." The court summarized Brian's objection to the trust's purported sale of its C-NH stock in 2005 as "[t]he sale transaction is not reported

---

[7] On appeal Roger M. and Brian appear to question the identity or the ownership (or both) of the entity that acquired the C-NH stock. Nevertheless, the parties agree that the purported effect of the 2005 transaction was to transfer effective ownership of all C-NH shares to Roger W. and Julie.

correctly." In response to that objection, the court observed that the accounting included "four entries related to the C-NH sale made on 1/06/05" and that these "add[ed] up to the sale price of $3,791,826," "which total the amount stated on the Summary of Account." The court found that "no evidence has been introduced upon which the court could rule that C-NH should be determined to be an asset of Pacific Trust."

b.      *No Breach*

Roger M. and Brian contend the law required the probate court to find that Roger W. and Julie breached their duty of loyalty and violated the terms of the Pacific Trust because the undisputed evidence established that Roger W. and Julie engaged in self-dealing when they acquired the trust's stock in C-NH. Roger M. and Brian ask us to reverse that "portion of the judgment blessing the C-NH transfer" with directions to order Roger W. and Julie to return the C-NH common shares to the Pacific Trust.

Roger W. and Julie concede, and we agree, that they engaged in self-dealing when they acquired the Pacific Trust's stock in C-NH. But not every act of self-dealing is a breach of the duty of loyalty. In particular, "[a] trustee may be authorized by the terms of the trust . . . to engage in transactions that would otherwise be prohibited by the rules of undivided loyalty . . . . For example, the terms of a trust may permit the trustee personally to purchase trust property . . . ." (Rest.3d Trusts, § 78, com. c(2); see *Uzyel*, *supra*, 188 Cal.App.4th at p. 905 [a trustee "is strictly prohibited from engaging in transactions in which the trustee's personal interests may conflict with those of the beneficiaries without the express authorization of either the trust instrument, the court, or the beneficiaries"].) The Pacific Trust authorizes the trustor, Roger W., to purchase trust assets unless the trustor does so "for less than a full and adequate consideration in money or money's worth." [8]

---

[8]      Roger M. and Brian do not argue that, because Julie was a special trustee and not the trustor of the Pacific Trust, her and Roger W.'s acquisition of the C-NH stock fell outside the provision authorizing self-dealing.

The evidence is undisputed that Roger W. and Julie purchased the Pacific Trust's C-NH stock. But did they give "full and adequate consideration" for it? The parties point to conflicting evidence of the amount paid for the stock. But they agree, as do we, that none of the parties presented any evidence of the stock's actual value or whether the amount paid was "full and adequate consideration." Without such evidence, we cannot say whether Roger W. and Julie exceeded the scope of the trust's authorization of self-dealing, or conclude that the probate court erred in failing to find that Roger W. and Julie breached their fiduciary duty or the terms of the trust in acquiring the C-NH stock.

We disagree with Roger M. and Brian's suggestion (for which they cite no authority) that, with the introduction of evidence that Roger W. and Julie engaged in self-dealing, the burden shifted to Roger W. and Julie to prove the amount paid for the C-NH stock was "full and adequate" and that their failure to do so required a finding that they breached the duty of loyalty. Where a beneficiary alleges and seeks relief for a trustee's breach of duty, "the beneficiary has the initial burden of proving the existence of a fiduciary duty and the trustee's failure to perform it." (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 853 (*Van de Kamp*); accord, *LaMonte v. Sanwa Bank California* (1996) 45 Cal.App.4th 509, 517 (*LaMonte*).) If the beneficiary carries that burden, "[t]he burden then shifts to the trustee to justify its actions." (*Van de Kamp*, at p. 853; accord, *LaMonte*, at p. 517.) Roger M. and Brian had the burden not only to prove self-dealing, but also to prove breach. (See *Van de Kamp*, at p. 854 [plaintiffs had burden to prove trustee-bank's practices breached its duty of loyalty before burden shifted to bank to justify those practices]; Rest.3d Trusts, § 93, com. b ["[a] breach of trust occurs if the trustee . . . fails to do what the fiduciary duties of the particular trusteeship require or does what those duties forbid"].) By failing to introduce any evidence regarding the value of the C-NH stock, or on the issue whether the amount Roger W. and Julie paid for the stock was "full and adequate consideration," Roger M. and Brian failed to carry their burden. Indeed, the probate court could only find otherwise by presuming that the amount paid for the C-NH stock was *not* "full and adequate consideration." A trustee is entitled to exactly the opposite presumption.

18

(See *Neel v. Barnard* (1944) 24 Cal.2d 406, 420 [trustee is "entitled to the benefit of the presumptions of regularity and good faith"]; *Burke v. Maguire* (1908) 154 Cal. 456, 468 ["'[t]he presumption is in favor of the performance of his duty by the trustee; the plaintiff must therefore allege and prove affirmatively a breach of the trust'"]; *In re Canfield's Estate* (1947) 80 Cal.App.2d 443, 451 [because trustee was entitled to "presumptions of regularity and good faith on its part," it "was not required to anticipate and defend against charges of dereliction of duty and malfeasance"].)

Moreover, while, "'[o]n an accounting for a trust, the trustee [has] a burden to establish the correctness of his accounts,'" that rule "'goes merely to items in the account,'" and "'does not require the trustee to anticipate and defend against charges of dereliction of duty and malfeasance.'"[9] (*Neel v. Barnard*, *supra*, 24 Cal.2d at p. 420; see *Rivero v. Thomas* (1948) 86 Cal.App.2d 225, 236 ["[t]he trustee has the burden of establishing the correctness of trust accounts, but is not required to anticipate charges of dereliction of duty"]; see also *Burke v. Maguire*, *supra*, 154 Cal. at p. 468 [plaintiff seeking to charge trustee with breach must "'state a clear case upon his bill'" and allege the "'acts of a trustee which may, or may not, be breaches of trust'"].) Roger M. and Brian do not cite any part of the record (nor can we find any) where they alleged or argued in the probate court that their parents engaged in impermissible self-dealing when they acquired the Pacific Trust's stock in C-NH. At trial Roger M. and Brian argued only that the accounting incorrectly stated the trust's sale of the C-NH stock, not that Roger W. and Julie engaged in impermissible self-dealing when they acquired it, and, as noted, Roger W. and Julie did not have to anticipate that their sons would make such a claim. (See *Neel v. Barnard*, at p. 420; *Rivero v. Thomas*, at p. 236.)[10]

---

[9] Roger M. and Brian do not challenge the sufficiency of the evidence supporting the trial court's finding that the Pacific Trust accounting was accurate and supported by appropriate documentation or other evidence.

[10] Roger M. and Brian argue for the first time in their reply brief that "the probate court erroneously refused even to consider the possibility that Transpacific was actually

B.      *The Probate Court Properly Recognized and Gave Preclusive Effect to the BVI Court's Decision*

1.      *Relevant Proceedings*

Beginning in the 1960s, Roger W. enjoyed considerable success producing and distributing films outside the United States through foreign entities he formed for that purpose, including Nebula Ltd. and Emerald City Ltd.  These companies retained and invested their profits outside the United States.  In 2002 Roger W. consolidated these holdings by transferring the companies' assets to a single, BVI-registered entity called Pasig.  Pasig's assets were managed by Citco Trustees SA, which designated Tortrust Corporation Company Limited, a BVI entity affiliated with Citco, as the sole owner of all Pasig's shares.  Roger W.'s longtime friend Cirio Santiago, a Filipino national, was the sole beneficial owner of Pasig, although Roger W. retained "exclusive power to authorise any and all business and/or legal transactions of Pasig."  By 2009 Pasig's assets were valued at approximately $76 million.

In November 2009 Roger M. and Brian contacted Citco to assert an interest in Pasig's assets, claiming the assets belonged to the Pacific Trust.  Roger M. and Brian also claimed that Pasig's assets had been used to fund two other irrevocable trusts, the Loving Trust and the Pasig Trust, of which they and their sisters were the beneficiaries.  Santiago's death in 2008 further complicated the issue of who owned Pasig's assets.

owned by the Pacific Trust.  If it did own Transpacific, that would have made the supposed sale just a transfer of funds from one Pacific Trust pocket to another, but with the C-NH stock disappearing into Roger W.'s and Julie's personal hands."  Roger M. and Brian have waived this argument by failing to raise it in their opening brief.  (See *Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1358.)  In addition, Roger M. and Brian do not explain in what sense the C-NH stock could "disappear[ ] into Roger W.'s and Julie's personal hands" if it was sold to an entity (Transpacific) owned not by them but by the Pacific Trust.  In other words, under the scenario Roger M. and Brian suggest, it is not clear how the stock sale would be self-dealing.

In September 2011 Citco, Tortrust, and Pasig filed an interpleader action in the British Virgin Islands, before the BVI court, to determine the beneficial owner of Pasig and its assets. The action named as defendants Roger W., Julie, the four Corman children, the estate of Santiago, Bay City Productions Inc. (a company owned by Roger M.), Margaret Lodise, in her capacity as temporary trustee of the Pacific Trust, and Helene Lewis, whom the BVI court appointed to represent the interests of the Tessa Trust. Roger W., Julie, Brian, Lodise, Lewis, and a representative of Santiago's estate voluntarily submitted to personal jurisdiction in the BVI court, and the remaining defendants—Roger M., Catherine, Mary, and Bay City Productions—were served with notice of the action. Roger M. and Brian retained counsel in the BVI to represent them in the proceeding, as did Lodise.

In September 2012 Brian filed an affidavit in the proceeding, purportedly on behalf of all the Corman children, contending that Pasig's assets belonged to the Pacific Trust and the Tessa Trust and thus, ultimately, to him and his siblings. Brian argued that Pasig's assets had come from three companies—Nebula, Emerald City, and Transpacific—that were "legally and/or beneficially owned" by the Pacific Trust and the Tessa Trust at the time the assets were transferred to Pasig. Brian maintained that the estate of Santiago had no right to Pasig's assets, and that Roger W. and Julie had no right to them either, except in their capacity as trustees of the Pacific Trust and the Tessa Trust. Roger W. also filed an affidavit, setting forth his contention that he and Julie were the true beneficial owners of Pasig and its assets. Julie filed a separate affidavit, supporting her and Roger W.'s claim. Lodise filed an answer in the proceeding, in which she contested the claims by Roger W. and Julie.

On June 4, 2013 the BVI court held a hearing on the matter, and on June 11, 2013 the court issued a judgment declaring that Roger W. was the beneficial owner of Pasig and its assets. The court noted Brian contended "that his parents . . . were liable to account to the Pacific and Tessa Trusts for the amounts transferred from the offshore companies to Pasig and from which the current Pasig assets are derived," but stated that Brian "did not appear and was not represented at the [June 4] hearing and he can

21

therefore be ignored for present purposes." The court also noted Lodise's contention that "it might turn out to be the case that the Pacific Trust might have an indirect claim to some unidentifiable portion of the Pasig assets." The court ruled, however, that, "as between the parties to the present proceedings, the beneficial ownership of the Pasig assets can and should be decided now. The fact that at some time in the future some third party, unaffected by that determination, may make its own claim against the person determined to be the beneficial owner of the Pasig assets is irrelevant." The court observed that Lodise was "in no position presently to challenge" the evidence Roger W. presented in support of his claim and that the court had "no reason to believe that she ever will be in any such position." The court concluded: "In fact, I have no doubt . . . that [Roger W.] is, in the absence before me of anyone who can put forward a better title, the beneficial owner of the Pasig assets. Since I have no material upon which I can decide that [Julie] is jointly beneficially entitled with her husband, I shall make a declaration that he is absolutely entitled to the Pasig assets. It will then be up to him how he deals with them."

The probate court recognized the BVI court's judgment under the doctrine of comity and gave it preclusive effect under the doctrine of res judicata. The probate court ruled that the BVI court's judgment mooted Roger M. and Brian's petition regarding ownership of Pasig and its assets, and therefore dismissed the separate petition by Roger M. and Brian regarding the BVI assets with prejudice.


2.	*Comity*

Roger M. and Brian argue that the probate court erred in recognizing the BVI court's judgment under the doctrine of comity because the judgment violated California's public policy. "The doctrine of comity prescribes that a court of this nation recognize the judgment of a court of a foreign nation when the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 314; accord, *Levin v. Ligon* (2006) 140 Cal.App.4th 1456, 1475.) A party often seeks recognition of a foreign

22

judgment in order to have it enforced, but "recognition may also be sought so that a party may rely on res judicata or collateral estoppel principles." (*Manco Contracting Co. (W.W.L.) v. Bezdikian* (2008) 45 Cal.4th 192, 205-206; see *Renoir v. Redstar Corp.* (2004) 123 Cal.App.4th 1145, 1150, fn. 1 ["'[t]he judgment of a foreign state may not be enforced unless it is entitled to recognition,'" and "'[w]hether a foreign judgment should be recognized may be in issue . . . not only in enforcement . . . but in other contexts, for example where the defendant seeks to rely on a prior adjudication of a controversy (*res judicata*), or where either side in a litigation seeks to rely on prior determination of an issue of fact or law'"]; *Ohno v. Yasuma* (9th Cir. 2013) 723 F.3d 984, 987, fn. 2 [in recognizing a judgment, a court acknowledges that it may have preclusive effect].) "Extension or denial of comity is discretionary and is reviewed on an abuse of discretion standard." (*In re Stephanie M.*, at p. 314.)

Roger M. and Brian argue that the BVI court's decision violates California's public policy because it condones trustee self-dealing. "Such a result," they argue, "would conflict with the most elementary principles of California law by upholding a breach of trust that California law would never permit." Putting aside that, as discussed, not every instance of trustee self-dealing is a breach of the trustee's duty of loyalty under California law,[11] the BVI court's decision does not condone trustee self-dealing. Roger M. and Brian make much of Roger W.'s testimony in the BVI proceeding that he "notionally parked" ownership shares of Nebula with the Pacific Trust and ownership shares of Emerald City with the Tessa Trust. According to Roger M. and Brian, this means that Roger W. effectively transferred ownership of those shares to the trusts, and that therefore he engaged in self-dealing when he transferred the assets of Nebula and Emerald City to Pasig. They suggest the BVI court accepted and approved this characterization of events.

---

[11]    Like the Pacific Trust, the Tessa Trust authorizes self-dealing by the trustors, Roger W. and Julie, under certain conditions.

23

The BVI court, however, did not accept that characterization of events. First, the BVI court did not accept that "notionally parked" effectively meant "transferred." In addressing the alleged transfer of Nebula shares to the Pacific Trust, the court concluded that Roger W. did not donate those shares to the trust, but merely "la[id] down a marker" to indicate, in the event he died, his ultimate plan at that time for all his offshore assets, which was to settle them in trusts for the benefit of his children and grandchildren. The BVI court found that Roger W. never completed this plan. Second, the court did not accept that anyone other than Roger W. owned a cognizable interest in the assets of Nebula and Emerald City when Roger W. transferred those assets to Pasig. Rather, the BVI court found those assets "were from start to finish intended to be at the entire disposition of" Roger W. Thus, neither the Pacific Trust nor the Tessa Trust had an interest in the assets that would support a claim against Roger W. for self-dealing. Therefore, the BVI court's decision did not violate California's public policy by condoning self-dealing, and the probate court properly recognized the BVI court's judgment under the doctrine of comity.[12]

### 3. *Res Judicata*

Roger M. and Brian also argue that the probate court erred in giving the BVI judgment preclusive effect under the doctrine of res judicata. "Res judicata" is an umbrella term, frequently used to encompass two separate concepts: claim preclusion and issue preclusion. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 823.) Issue preclusion, sometimes also called "collateral estoppel," is the relevant doctrine here. (See *ibid.*; *Gilb v. Chiang* (2010) 186 Cal.App.4th 444, 459 [purely declaratory

---

[12] We do not consider Roger M. and Brian's argument, raised for the first time in their reply brief, that the trial court erred in granting comity to the BVI court's decision because the BVI court denied due process to Brian, the Pacific Trust, and the Tessa Trust. (See *Lamar Central Outdoor, LLC v. City of Los Angeles* (2016) 245 Cal.App.4th 610, 620 ["we will not consider arguments raised for the first time in a reply brief"]; *In re Estate of DeLoreto* (2004) 118 Cal.App.4th 1048, 1053 ["[w]e need not decide issues raised for the first time in the reply brief"].)

24

judgments are issue preclusive, not claim preclusive].) "*Issue preclusion* prohibits the relitigation of issues argued and decided in a previous case . . . . [Citation.] Under issue preclusion, the prior judgment conclusively resolves an issue actually litigated and determined in the first action. [Citation.] There is a limit to the reach of issue preclusion, however. In accordance with due process, it can be asserted only against a party to the first lawsuit, or one in privity with a party." (*DKN Holdings LLC v. Faerber*, at p. 824.) "In summary, issue preclusion applies: (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.* at p. 825.) "The application of the doctrine of res judicata is a question of law we review de novo." (*State Farm General Ins. Co. v. Workers' Comp. Appeals Bd.* (2013) 218 Cal.App.4th 258, 268, fn. 4; accord, *Crosby v. HLC Properties, Ltd.* (2014) 223 Cal.App.4th 597, 602.)

Roger M. and Brian do not dispute that the first and fourth requirements were satisfied: the BVI judgment was final, and its preclusive effect was asserted in the present action against Roger M. and Brian, who were parties to the BVI proceeding. Contrary to the arguments of Roger M. and Brian, however, the second and third requirements were satisfied as well: the issue Roger M. and Brian were precluded from relitigating, whether Roger W. and Julie held Pasig or its assets for the benefit of the Pacific or Tessa Trust, was actually litigated and necessarily decided in the BVI proceeding. In the affidavit Brian submitted to the BVI court in September 2012, he contended that Pasig belonged to the Pacific Trust and the Tessa Trust and that Roger W. and Julie had no claim to Pasig's assets other than as trustees of those trusts. Appearing on behalf of the Pacific Trust, Lodise contested the claim by Roger W. and Julie that they were the true beneficial owners of Pasig and its assets, and she argued in support of the Pacific Trust's claim to Pasig's assets. The BVI court appointed Lewis to assert any such interest on behalf of the Tessa Trust and gave her an opportunity to do so. Thus, the issue of whether Roger W. and Julie held Pasig or its assets for their personal benefit or for the benefit of the Pacific Trust and the Tessa Trust was raised and litigated in the BVI court, which, finding the issue ripe for decision, concluded that Roger W. was the beneficial

25

owner of Pasig and its assets. (See *Murphy v. Murphy* (2008) 164 Cal.App.4th 376, 400 ["'"[w]hen an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined, the issue is actually litigated"'"]; *Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 896 ["[a]n issue is '"necessarily decided"' in a prior proceeding if the issue was not '"entirely unnecessary" to the judgment' in the prior proceeding"].)

Contrary to Roger M. and Brian's principal contention, the BVI court did not "defer[ ] any decision on the trusts' claim that Roger W. holds Pasig assets for the trusts' benefit." The court stated that "as between the parties to the present proceedings," which included the Pacific Trust and the Tessa Trust and their beneficiaries, "the beneficial ownership of the Pasig assets can and should be decided now." The court then declared that, "in the absence before me of anyone who can put forward a better title" (and as noted the two trusts were before the court), Roger W. was "the beneficial owner of the Pasig assets" and "is absolutely entitled to" them. (See *Aerojet-General Corp. v. American Excess Ins. Co.* (2002) 97 Cal.App.4th 387, 402 [declaratory judgment is conclusive as to matters declared].)

In support of their assertion that the BVI court deferred deciding the trusts' claims to Pasig's assets, Roger M. and Brian cite the BVI court's statement that "[t]he fact that at some time in the future some third party, unaffected by [the court's] determination, may make its own claim against the person determined to be the beneficial owner of the Passig assets is irrelevant." Roger M. and Brian argue that the Tessa Trust "would certainly be one of those third parties to make its own claim, because the BVI court never acquired jurisdiction over it."

This argument fails for three reasons. First, the BVI court's reference to "some third party, unaffected by [the court's] determination" does not include the Tessa Trust. As noted, the Tessa Trust was a party to the proceeding, and the BVI court indicated it was deciding the beneficial owner of the Pasig assets "as between the parties to the present proceedings." Indeed, the context of the BVI court's statement on which Roger M. and Brian rely makes clear that the BVI court was referring to Nebula, because Lodise

26

had suggested there was "merit in having Nebula restored to the register of companies in the Bahamas in order that a claim may be pursued on its behalf."[13]

Second, to the extent Roger M. and Brian are arguing that the BVI court could not have decided the Tessa Trust's claim to Pasig's assets because the BVI court did not have jurisdiction over the Tessa Trust, the argument lacks support. The only authority Roger M. and Brian cite for their contention that the court lacked jurisdiction over the Tessa Trust, *Estate of Bodger* (1954) 128 Cal.App.2d 710, does not concern a court's jurisdiction over a party, but a court's authority to appoint counsel for a party. (See *id.* at p. 715 [court's appointment of counsel for party who was not present but had notice of the proceeding exceeded the court's authority and violated due process].) Even assuming the BVI court exceeded its authority in appointing counsel to represent the Tessa Trust in the BVI proceeding (which Roger M. and Brian have not demonstrated), Roger M. and Brian do not explain how this establishes that the BVI court "never acquired valid jurisdiction over [the Tessa Trust]." In particular, they do not dispute that the BVI court had jurisdiction over the Tessa Trust's trustee (Julie), special trustee (Roger W.), beneficiaries (Roger M., Brian, and their sisters), and the property at issue (Pasig and its assets). (See Bogert, The Law of Trusts and Trustees § 292 [forum court generally has jurisdiction to adjudicate interests in trust property "by reason of its relationship to the trust, the trust parties or the trust property," and "[w]here both the trustee and trust assets are subject to the court's jurisdiction, the court can adjudicate any controversy relating to beneficial interests in those assets"]; see also *Estate of Giraldin* (2012) 55 Cal.4th 1058, 1073 [considering this treatise in interpreting California trust law].)

Third, to the extent Roger M. and Brian are arguing that the Tessa Trust was not bound by the BVI court's decision regarding the ownership of Pasig's assets because, as they put it, "[a] decision cannot bind a party over whom the rendering court had no jurisdiction," the argument is not relevant. What matters is that Roger M. and Brian, as

---

[13]    Lodise made this suggestion because she contended the Pacific Trust held an ownership interest in Nebula and therefore might be able "to bring derivative proceedings on Nebula's behalf for the recovery of the transferred funds."

27

parties to the BVI proceeding, were bound in this action by the decision under the principles of issue preclusion. (See *DKN Holdings LLC v. Faerber*, *supra*, 61 Cal.4th at 827 ["[t]he point [of issue preclusion] is that, once an issue has been finally decided *against* such a party, that party should not be allowed to relitigate the same issue in a new lawsuit"].)

Finally, Roger M. and Brian argue that two other statements in the BVI judgment indicate the BVI court deferred a decision on the Pacific Trust and Tessa Trust's claim to Pasig's assets. The first is the court's statement that, because Brian did not attend the June 4, 2013 hearing, he could "be ignored for present purposes."[14] Whatever the BVI court may have meant by its statement that it "ignored" Brian, however, the BVI court's other statements indicate that the BVI court considered the issue of whether the Pacific Trust and the Tessa Trust had a claim to Pasig's assets and the BVI court believed it was deciding the issue. The second is the BVI court's supposed statement that "it was uncertain" whether Lodise could offer evidence to support the Pacific Trust's claim. Roger M. and Brian, however, misquote and mischaracterize the BVI court's ruling. The BVI court did not express uncertainty about whether Lodise could offer evidence to support her claims, but rather the opposite. For example, in its conclusion, the court stated: "In my judgment and for the reasons given above Ms. Lodise has no prospect whatsoever of proving now or at any time in the future" the claims she advanced on behalf of the Pacific Trust.

The BVI court decided, without deferring the issue, that neither the Pacific Trust nor the Tessa Trust was the beneficial owner of Pasig's assets. The probate court did not err in giving res judicata effect to the BVI judgment.[15]

---

[14] Brian does not contend he did not have a full and fair opportunity to attend the hearing.

[15] Roger M. and Brian argue for the first time in their reply brief that res judicata does not apply to the BVI judgment because the BVI court lacked jurisdiction to rule on the internal affairs of a California trust. Again, we do not decide this issue. (See *In re*

28

C.     *The Probate Court Erred by Reforming the MG Trust*

1.     *Relevant Proceedings*

Section 2 of the MG Trust requires the trustees to "divide the trust estate into four (4) equal shares, one (1) such share for each child of the settlors [i.e., Roger W. and Julie]." Section 2.1 provides that "[e]ach share allocated to a child of the settlors" is subject to three distribution provisions. First, section 2.1.1, entitled "Distributions of income and principal," provides: "During the lifetime of the survivor of the settlors, the trustees shall accumulate all of the income of the trust and add such income to principal. At and after such time as neither of the settlors is living, the trustees shall pay to . . . such child as much of the net income and principal of such child's trust as the trustees in the trustees' discretion deem necessary . . . .  Any net income not so distributed shall be accumulated and added to principal."

Second, section 2.1.2, entitled "Distributions at attained ages," provides: "When such child attains age thirty (30) years, the trustees shall distribute to such child one-quarter (1/4) of the principal of such child's trust as then constituted; when such child attains age thirty-five (35) years, the trustees shall distribute to such child one-third (1/3) of the principal of such child's trust as then constituted"; and so on, until the undistributed balance of the child's trust is distributed at age 50. Section 2.1.2 concludes: "If at any time after such child attains age twenty-five (25) years, the undistributed balance of such child's trust shall be less than [$10,000], the trustees shall distribute such balance to such child."

Third, section 2.1.3, entitled "Power to withdraw," provides: "During the lifetime of the survivor of the settlors, such child . . . may demand in writing, within thirty (30) days after receipt of notice from the trustees, but not later than December 31 of a year in which a transfer to such child's trust has been made by any person (the 'withdrawal period')," certain specified amounts, depending on the circumstances.

*Estate of DeLoreto*, *supra*, 118 Cal.App.4th, at p. 1053 ["[w]e need not decide issues raised for the first time in the reply brief"].)

29

In their petition regarding the MG Trust, Roger M. and Brian alleged that Roger W. and Julie, as trustees, violated the terms of section 2.1.2 by failing to distribute any portion of the principal to the Corman children, who were all over the age of 30.[16] Roger M. and Brian sought immediate distribution of the MG Trust principal according to the terms of section 2.1.2.

Julie testified at trial that when she signed the MG Trust as co-settlor and co-trustee, she understood and intended that the beneficiaries would not receive any trust assets until both she and Roger W. died. She testified that her understanding was based on the advice of her attorney and on the trust document. Roger W. similarly testified that he intended distributions from the MG Trust would not occur until after both he and Julie died. "I think that's the intention [of section 2.1.2]," he testified, "and I think it's not well-phrased."

The court found that the terms of section 2.1.2 were "contrary to the intent of the [s]ettlors," who intended that the beneficiaries of the MG Trust would receive their principal distributions only after both Roger W. and Julie died. In addition to Julie's testimony, the court noted that section 2.1.2 was not consistent with "the corresponding terms" of the Pacific and Tessa Trusts, which provided for principal distributions only after both Roger W. and Julie died. The court also reasoned that, if section 2.1.2 had accurately reflected Roger W. and Julie's intention, they would have already distributed portions of the trust. Based on these findings, the language of the MG Trust, Probate Code section 21102, subdivision (c) (which allows the court to use extrinsic evidence to determine the intention of a transferor), and *Estate of Russell* (1968) 69 Cal.2d 200, 206 (which discusses the interpretation of a will in accordance with the testator's intention and the existence of patent and latent ambiguities), the court found that "there is a latent ambiguity in the language of the Trust." The court ruled that there was ambiguity in section 2.1.2 and section 2.1.3 because the amounts available for distribution under the latter are based on figures that would be affected by any distributions made, during Roger

---

[16] This allegation was incorrect. Their younger sister, Mary, was only 27 at the time of trial in July 2013.

W. or Julie's lifetime, under the former. The court stated that, "if the distributions of paragraph 2.1.2 are to be enforced and the fractional distributions were to have already been made, then it would be almost impossible to calculate what additional withdrawals a beneficiary might be entitled to" under section 2.1.3. The court also found that, even if there were no latent ambiguity, Roger W. and Julie intended that the MG Trust would distribute its assets only after they both died, and the terms of section 2.1.2 resulted from a drafting mistake. Therefore, the court reformed the MG Trust so that the distributions set forth in section 2.1.2 will occur "[a]t and after such time as neither of the settlors is living."

### 2. *The Error*

A court has equitable power to modify a trust if a "peculiar" or "exceptional" circumstance makes modification necessary to accomplish the trustor's purpose and there is some expression of that purpose in the trust instrument. (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 82 (*Ike*); accord, *Giammarrusco v. Simon* (2009) 171 Cal.App.4th 1586, 1605; see *Aguilar v. Aguilar* (2008) 168 Cal.App.4th 35, 39 [""""the primary rule in construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the trustor or settlor""""].) This power extends to situations where "the trust instrument contains some expression of the trustor's intention, but a drafting error renders that expression ambiguous." (*Ike*, at pp. 81-82; accord, *Giammarrusco v. Simon*, at p. 1605; see *Ike*, at p. 75 [ambiguity exists when """"the written language is fairly susceptible of two or more constructions""""].) Such ambiguity may be patent, i.e., apparent on the face of the trust instrument, or it may be latent, i.e., not apparent on the face of the instrument but disclosed by collateral facts. (See *Estate of Russell* (1968) 69 Cal.2d 200, 211.) In either case, if the expression of the trustor's intent is ambiguous, the court may look to extrinsic evidence to ascertain that intent. (*Id.*, at p. 206; see *Ike*, at p. 74 ["[w]here a trust instrument contains some expression of the trustor's intention, but as a result of a drafting error that expression is made ambiguous, a trial court may admit and consider extrinsic evidence, including the drafter's testimony, to resolve the ambiguity

31

and give effect to the trustor's intention as expressed in the trust instrument"]; accord, *Giammarrusco v. Simon*, at p. 1605.)  Extrinsic evidence is not admissible, however, to give the trust instrument "a meaning to which it is not reasonably susceptible."  (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453; accord, *Ike*, at p. 73.)

Interpreting a written instrument, including a declaration of trust, is a question of law we consider de novo, so long as interpretation does not turn on the competence or credibility of extrinsic evidence or a conflict in that evidence.  (*Burch v. George* (1994) 7 Cal.4th 246, 254; accord, *Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 539-540; see *Alameda County Flood Control v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1180 ["[*i*]*f* extrinsic evidence factually conflicts, the trial court's resolution of that conflict is reviewed for substantial evidence, otherwise the trial court's ultimate interpretation of the contract is reviewed de novo"].)

It is difficult to see any relevant patent ambiguity in section 2.1.2 or among the distribution provisions of section 2.1 considered together.  (See § 21121 ["[a]ll parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole"].)  As drafted, section 2.1.2 provides for mandatory distributions of portions of the principal as the children attain certain ages without regard to whether Roger W. or Julie is living, while section 2.1.1 provides for discretionary distributions of income and principal only after both Roger W. and Julie have died, and section 2.1.3 provides for distributions in response to demands made after a transfer only while Roger W. or Julie is living.  The relevant language in these provisions does not appear "'fairly susceptible of two or more constructions.'"  (*Ike*, *supra*, 61 Cal.App.4th at p. 74.)  It appears fairly susceptible of only one:  Section 2.1.2 requires distribution of fractions of trust principal at the times specified, regardless whether Roger W. and Julie are alive or dead.

Roger W. and Julie contend that the relationship between sections 2.1.2 and 2.1.1

32

creates a patent ambiguity.[17]  They argue that the provision in section 2.1.2 for mandatory distributions during the settlors' lifetimes conflicts with section 2.1.1 because the latter sets forth a distribution scheme "in which the trustee can make *only* discretionary distributions of principal and *only* 'after such time as neither of the settlors is living.'" Section 2.1.1, however, contains no such restriction on the distribution of principal. Section 2.1.1. merely confers on the trustee, after both settlors have died, the power to distribute as much of the principal (and income) as the trustee deems necessary, without speaking to what other distributions of principal may be made.  Roger W. and Julie also argue that the trustee cannot accumulate "all of the income of the trust" during the lifetime of the settlors, as provided in section 2.1.1, and simultaneously distribute portions of the principal, as provided in section 2.1.2, because "[t]he income from distributed principal cannot be accumulated."  This is a false problem.  Distributed principal, by definition, is no longer part of the trust, and thus does not generate "income of the trust" to be accumulated under section 2.1.1.  (See § 16324 ["'[i]ncome' means money or property that a fiduciary receives as current return from a principal asset"].)

Roger W. and Julie also argue that a patent ambiguity arises from the relationship between section 2.1.2 and section 2.1.3.  They note that the amounts available for withdrawal during the lifetime of the settlors under section 2.1.3 are based on a percentage of all property held in trust on the last day of a specified "withdrawal period." They argue that "it is impossible to calculate the amounts available for withdrawal" under section 2.1.3 if section 2.1.2 is enforced as written because, in theory, a beneficiary might reach one of the designated ages under section 2.1.2 on the last day of a withdrawal period under section 2.1.3.  In that event, the trust principal would be subject to distribution under section 2.1.2 on the same day that section 2.1.3 required the trustee to determine the amount of all property held in trust.  According to Roger W. and Julie, this

---

[17]     Roger W. and Julie do not argue in their brief that there is any latent ambiguity in the terms of the MG Trust.

33

"creates an endless loop in which it is impossible to perform the calculations required by the trust."[18]

Roger W. and Julie fail to explain, however, why the "loop" they contrive would necessarily be "endless." In fact, in section 4, entitled "Powers of Trustees," the trust anticipates that the terms of the trust or even the applicable provisions of the Probate Code may not provide an answer for all questions concerning the amount and character of trust assets, and in that event provides that such matters "shall be determined by the trustees in [their] reasonable discretion in accordance with common practice and understanding." Moreover, to the extent Roger W. and Julie's hypothetical demonstrates a problem, the culprit is section 2.1.3, because it requires the trustee to determine the amount "of all property held in trust on the last day of the withdrawal period (*whether under this instrument or otherwise*) over which such child shall have a lifetime power of withdrawal at any time during such calendar year" (emphasis added). Thus, in addition to all property held by the MG Trust, the trustee must take into account all property held by the Pacific Trust and the Tessa Trust, both of which indisputably permit discretionary distributions while Roger W. or Julie is alive. In theory, those distributions could occur on the last day of the "withdrawal period" under section 2.1.3 of the MG Trust, creating the same "loop" Roger W. and Julie complain of.

That said, the distribution provisions are not entirely free of all potential ambiguity. For example, although not argued by Roger W. and Julie, section 2.1.1 addresses the administration of trust income "[d]uring the lifetime of the *survivor* of the settlors" (italics added) and "[a]t and after such time as neither of the settlors is living," but does not address the administration of income while *both* settlors are living. In addition, although also not argued by Roger W. and Julie, section 2.1.1 provides for discretionary distributions of income and principal (after the death of both settlors) to "such child," meaning any Corman child, because the most direct antecedent of "such

_____

[18] Roger W. and Julie also argue that "the same problem exists in reverse" because section 2.1.2 provides for fractional distribution "of the principal of such child's trust *as then constituted*."

34

child" is in the statement in section 2.1 that "[e]ach share allocated to a child of the settlors shall be retained and administered in a separate trust by the trustees as follows. . . ." Section 2.1.2, however, also uses the phrase "such child," in providing for fractional distributions of trust principal when "such child" reaches specified ages, but at that point in the document "such child" could refer to "a child of the settlors" in section 2.1, thus again meaning any Corman child, or it could refer to the "such child" discussed in section 2.1.1, meaning any Corman child receiving discretionary distributions under section 2.1.1.

Even if such potential ambiguities allowed the consideration of extrinsic evidence, reformation was not appropriate here. Roger W. and Julie rely primarily on the argument that their testimony at trial regarding their intent at the time they created the MG Trust is the best evidence of their intention that there would be no distributions of principal until after both of them die. The trust, however, contains no language evidencing this intent, and there is no evidence that, prior to their testimony in this proceeding, Roger W. and Julie ever disclosed such an intent to anyone. The only evidence at trial was that Roger W. and Julie, despite the language of section 2.1.2, subjectively understood and intended, without telling anyone, that the beneficiaries of the MG Trust would not receive any principal until both settlors had died. Evidence of such "undisclosed subjective intent," however, is generally irrelevant to the issue of the meaning of language in a written instrument. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3; accord, *San Pasqual Band of Mission Indians v. State* (2015) 241 Cal.App.4th 746, 757; see *Mission Valley East, Inc. v. County of Kern* (1981) 120 Cal.App.3d 89, 97 ["[t]he law governing interpretation of written instruments establishes that the *subjective intent* of a party is of no moment in ascertaining the meaning of the words used in the instruments"].) Indeed, permitting reformation of an irrevocable trust based on evidence of a trustor's unexpressed subjective intent would destroy the irrevocable nature of the trust by allowing the trustor to modify its terms simply by stating he or she had a different intent.

Roger W. and Julie also point to the fact that they made no distributions under section 2.1.2 when Catherine, Roger M., or Brian turned 30 (which occurred before

35

Roger M. and Brian began this litigation), nor is there any evidence Catherine, Roger M., or Brian requested a distribution when they turned 30. Quoting *Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal.2d 751, 761, Roger W. and Julie argue that this is significant because "'[w]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court.'" (See *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 798.) In other words, Roger W. and Julie urge us to consider the family members' "course of performance" in interpreting the trust document. (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 920 (*Employers Reinsurance*); see *City of Hope Nat. Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1133.)

While evidence of a course of conduct or performance may assist in revealing and interpreting ambiguity in written agreements, including trust instruments (*Employers Reinsurance*, *supra*, 161 Cal.App.4th at p. 920; see Code Civ. Proc., § 1856, subds. (a), (c), (h)), the evidence in this case does not establish any relevant course of conduct or performance. A course of performance is "'a sequence of conduct between the parties to a particular transaction that exists if: (1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.'" (*Employers Reinsurance*, at p. 920; see *C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1498.) Roger M. and Brian sued for distributions under section 2.1.2 in November 2009, after they had reached the first age designated for a distribution under section 2.1.2 (i.e., 30), but before they reached the second (35). Thus "repeated occasions" for distribution of MG Trust principal by Roger W. and Julie under section 2.1.2 did not pass "without objection" from Roger M. and Brian. (*Employers Reinsurance*, at p. 920; see *C9 Ventures v. SVC-West, L.P.*, at p. 1498 [no course of performance where agreement

36

lacked repeated occasions for performance].) Moreover, Roger W. and Julie do not cite any evidence, nor can we find any, that Roger M. or Brian were aware of the terms of section 2.1.2 when they turned 30. Nor is it a reasonable inference from the evidence that they were, in light of Brian's trial testimony that, whereas Roger W. and Julie regularly discussed with their children the much larger Pacific Trust prior to this litigation, they did not regularly discuss the MG Trust.

Roger W. and Julie also suggest their intent to preclude distributions of principal of the MG Trust until after both of their deaths is confirmed by the fact that the Pacific Trust and the Tessa Trust, which they contend they created as part of an "overall estate plan" that included the MG Trust, do not provide for mandatory distributions during their lifetimes. That evidence actually proves the opposite: Roger W. and Julie knew how to provide for distributions only after their death when that was what they intended. The different language of the Pacific Trust and the Tessa Trust is strong evidence that Roger W. and Julie intended distributions of principal from the MG Trust during their lifetimes.

Roger W. and Julie also argue that "the nature of the MG Trust's corpus confirms [their] intentions" because the trust's principal asset is a 99 percent limited partnership interest in the Corman Family Investment Partnership (CFIP), which in turn owns an office building. They argue that, "[a]s minority interests in a closely-held family partnership, any CFIP interests distributed to the MG Trust's beneficiaries would be highly illiquid assets, incapable of being sold to a third party except at a steep discount," and therefore "a child desperate for quick cash might sell his or her distributed interest to a stranger for a fraction of its true value." But the supposed problem Roger W. and Julie describe would arise upon *any* distribution of the trust's principal, regardless of whether the distribution occurred before or after both Roger W. and Julie had died. Moreover, the supposed problem Roger W. and Julie describe is just that: supposed. For example, there is no reason to assume that a child receiving a distribution under section 2.1.2 during Roger W. or Julie's lifetime would be "desperate for quick cash," nor any evidence that Roger M. or Brian has any current intention to sell his interest in the MG Trust to a stranger.

37

Finally, there was no evidence the MG Trust failed to express Roger W. and Julie's intent, or expressed it ambiguously, because of a drafting error. Julie testified that when she signed the MG Trust she understood, based in part on the "advice" of her attorney, that trust assets need not be distributed until after she and Roger W. died, but there was no testimony from Julie, the attorney, or anyone else concerning the attorney's role in the drafting of the trust. (Cf. *Ike*, *supra*, 61 Cal.App.4th at p. 87 [attorney who drafted trust testified concerning mistake].) In fact, there was no testimony at all regarding the drafting of the trust.

D.    *The Probate Court Did Not Commit Prejudicial Error in Limiting the Scope of the Proceedings to the Years 2004 to 2010*

Roger M. and Brian argue that the probate court prejudicially erred by denying their requests for trust accountings prior to 2004 and excluding from the trial evidence of events and transactions prior to 2004 and after 2010. We find no abuse of discretion in the former ruling, and any evidentiary error in the latter ruling harmless.

1.    *The Probate Court Did Not Abuse Its Discretion by Denying Roger M. and Brian's Requests for Trust Accountings Prior to 2004*

a.    *Relevant Proceedings*

In their petitions or during the proceedings, Roger M. and Brian requested an accounting of the three Corman trusts from their inception. At a hearing in June 2010, Judge Karlan indicated he would order accountings for the trusts and asked for argument on the appropriate time period for the accountings. When counsel for Roger M. and Brian suggested that the accounting period begin with 1990, Judge Karlan stated that, given the size of the Pacific Trust in particular, it was not practicable to prepare a timely accounting going back that far. The guardian ad litem suggested a seven-year period, noting that Roger W. and Julie would probably not be able to prepare a complete accounting from an earlier date because the banks generally do not retain records for

more than seven years. Judge Karlan, noting that disputes over the trusts had arisen only within the last two years, adopted the guardian ad litem's recommendation. Judge Karlan ordered Roger W. and Julie to prepare accountings for each trust for the period January 1, 2004 to June 30, 2010.

At the conclusion of trial in 2013, Judge Goetz denied Roger M. and Brian's request for an accounting of the Pacific Trust from the date of the trust's inception. Judge Goetz stated that this decision was based on the findings in her statement of decision and because under section 16062, subdivision (b), the trustee of the Pacific Trust had no statutory duty to account. (See § 16062, subd. (b) [trustee of a living trust created before July 1, 1987 is not subject to duty to account imposed by § 16062, subd. (a)].) The court also denied without further explanation Roger M. and Brian's request for accountings of the Tessa Trust and the MG Trust from their inception.

### b. *Analysis*

As a preliminary matter, Roger M. and Brian implicitly concede they had no statutory right to a pre-2004 accounting for any of the three trusts. Section 16062, subdivision (a), which governs a trustee's duty to account to beneficiaries, provides in relevant part that, "[e]xcept as otherwise provided in this section and in Section 16064, the trustee shall account at least annually . . . to each beneficiary to whom income or principal is required or authorized in the trustee's discretion to be currently distributed." Section 16062, subdivision (b), provides that this duty to account does not apply to a living trust created before July 1, 1987, which describes the Pacific Trust (created in 1978), but not the Tessa Trust (created in December 1987)[19] or the MG Trust (created in 1993). (See § 16062, subd. (b).) Section 16064, subdivision (a), provides that, with exceptions not relevant here, a trustee is not required to account to a beneficiary as provided in section 16062, subdivision (a), "[t]o the extent the trust instrument waives the

---

[19]     See footnote 2.

account." (§ 16064, subd. (a).) The Tessa Trust waives the trustee's duty to account until after the death of Roger W. and Julie. Finally, because the MG Trust did not require or authorize the trustee to distribute trust principal or income to Roger M. or Brian until they turned 30, section 16062, subdivision (a), did not provide them a right to an accounting before they reached that age. (§16062, subd. (a).) Neither Roger M. nor Brian turned 30 before 2004.

Because Roger M. and Brian had no statutory right to pre-2004 accountings, the decision whether to grant their request for those accountings was a matter for the trial court's discretion. (See *Esslinger v. Cummins* (2006) 144 Cal.App.4th 517, 526 [a beneficiary not entitled to an accounting under § 16062, subd. (a), may petition the court for an accounting under § 16061, and whether to order an accounting is within the court's discretion]; see also *Christie v. Kimball* (2012) 202 Cal.App.4th 1407, 1413 ["[d]etermining the need for an accounting is a matter within the trial court's sound discretion"]; *Walsh v. Jack Rubin & Sons, Inc.* (1960) 182 Cal.App.2d 652, 654-655 [whether to grant request for an accounting was "entirely within the discretion of the trial court"].) Roger M. and Brian argue that the probate court abused that discretion by denying their requests for pre-2004 accountings because Judge Goetz improperly accorded "conclusive effect" to what they describe was a "preliminary" order by Judge Karlan. Roger M. and Brian assert that there was no other "conceivable basis" for Judge Goetz's decision.

There is nothing in Judge Goetz's statement of decision, however, indicating that she treated Judge Karlan's order as dispositive of Roger M. and Brian's request for pre-2004 accountings, or that Judge Goetz failed to exercise discretion in ruling on that request. And we may not presume she did. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 ["[a] judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness"]; *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 556-557 ["the trial court's judgment is presumptively correct, such that error must be affirmatively demonstrated, and where the record is silent the reviewing court will indulge all

40

reasonable inferences in support of the judgment"]; *Estate of Gilkison* (1998) 65 Cal.App.4th 1443, 1449 [same].)

Moreover, there was indeed a "conceivable basis" for Judge Goetz's decision: based on the accountings prepared for 2004 through 2010 and the evidence presented at trial, Judge Goetz determined that Roger W. and Julie did not breach their fiduciary duties or commit any act of fraud or dishonesty, found that Roger M. and Brian were not credible, and noted that Catherine and Mary, the other two beneficiaries of the trusts, had become "victims" of their brothers' litigation. Given these litigation results on the accountings prepared for the years 2004 to 2010, Judge Goetz reasonably could have concluded that accountings for additional years were unwarranted and would be wasteful.[20] (See *Walsh v. Jack Rubin & Sons, Inc.*, *supra*, 182 Cal.App.2d at pp. 654-655 [court did not abuse its discretion in refusing to order trust accounting because it "may well have concluded from the evidence in [the] case" that it "would not help the court in a correct determination of the issues involved"].) The court did not abuse its discretion by limiting the accounting to 2004-2010. (See *Bank of America, N.A. v. Superior Court* (2013) 212 Cal.App.4th 1076, 1089 ["'[t]he abuse of discretion standard . . . measures whether, given the established evidence, the act of the lower tribunal falls within the permissible range of options set by the legal criteria'"].)

2. *Any Error in Excluding Evidence Relating to Periods Before 2004 and After 2010 Was Harmless*

At trial, the court stated it intended to limit evidence of events and transactions to the period for which the court had ordered the trustees to prepare accountings (i.e., 2004 to 2010) because that was the only relevant evidence. Roger M. and Brian maintain this

---

[20] The errors we have identified in the trial court's decision do not dictate otherwise. Proper interpretation of the MG Trust's distribution provisions was not dependent on an accounting, and the approximately $1.3 million Roger W. withdrew from the Pacific Trust in breach of his duty of loyalty (liability for which the trial court may still exercise its discretion to excuse under section 16440, subdivision (b)) was less than half the amount the court awarded in attorneys' fees and costs at the conclusion of trial.

41

was an abuse of discretion. They argue that, because their petitions alleged breaches of fiduciary duty outside that time period, "the scope of the accountings was not the scope of the trial." There was thus no basis, they contend, for what they maintain was a "blanket ruling" that categorically excluded evidence relating to time periods outside the 2004-2010 accounting period.

"We review a trial court's evidentiary rulings for abuse of discretion. [Citation.] This is particularly so with respect to rulings that turn on the relevance of the proferred evidence. [Citation.] This standard is not met by merely arguing that a different ruling would have been better. . . . There must be a showing of a clear case of abuse and miscarriage of justice in order to warrant a reversal. [Citation.] A trial court will abuse its discretion by action that is arbitrary or '"that transgresses the confines of the applicable principles of law."'" (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281; see *McCoy v. Pacific Maritime Assn.* (2013) 216 Cal.App.4th 283, 296 ["[t]he trial court's authority is particularly broad 'with respect to rulings that turn on the relevance of the proffered evidence'"]; *Estate of Young* (2008) 160 Cal.App.4th 62, 82 [to obtain relief from alleged abuse of discretion it must clearly appear that the alleged error resulted in a manifest miscarriage of justice]; *Estate of Gilkison*, *supra,* 65 Cal.App.4th at p. 1449 [same].)

The probate court's categorical exclusion of all evidence relating to events or transactions outside the 2004-2010 accounting period may have been a bit overbroad. The scope of the accountings was not the same as the scope of the alleged breaches of fiduciary duty. Indeed, evidence of events or transactions in, for example, December 2003 or January 2011 may tend to prove or disprove disputed factual issues regarding events and transactions during 2004-2010. (See, e.g., *Estate of Young, supra,* 160 Cal.App.4th at p. 83 [probate court allowed evidence of financial transactions that were relevant to prove allegations of undue influence in trust petition].)

Any error in the exclusion of pre-2004 and post-2010 evidence, however, was harmless because it did not result in a "miscarriage of justice." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574; see *MacQuiddy v. Mercedes-Benz USA, LLC* (2015)

233 Cal.App.4th 1036, 1045 [unnecessary to decide whether trial court's rulings were an abuse of discretion where appellant failed to demonstrate a miscarriage of justice].) To establish that an error resulted in a miscarriage of justice, an appellant must demonstrate that "there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.*, at p. 574; see *MacQuiddy v. Mercedes-Benz USA, LLC*, at p. 1045 [no miscarriage of justice because appellant "failed to demonstrate it is reasonably probable the outcome of the trial would have been more favorable to him" absent the purported error].)

Although they point to several instances in which they suggest the court applied its "blanket ruling" to exclude evidence regarding, or to preclude inquiry about, events or transactions outside the 2004-2010 time period, Roger M. and Brian do not attempt to show that the court would have ruled any differently in those specific instances had it not adopted a "blanket" approach. Nor do they attempt to explain how a different ruling in those instances would have affected the outcome of the trial. They simply suggest, in the most general way, that the probate court's categorical exclusion was "inherently prejudicial," and that, without explaining how, they "could have established" breaches of fiduciary duty outside the 2004-2010 time period. Roger M. and Brian have not established a miscarriage of justice. (See *Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 580 [declining to apply rules of "automatic reversal" or "'inherent' prejudice" to civil trial error]; *Conservatorship of Maria B.* (2013) 218 Cal.App.4th 514, 532-533 ["the appellant bears the burden to make an 'affirmative showing' the trial court committed error that resulted in a miscarriage of justice"].)

E. *The Award of Attorneys' Fees Against Roger M. and Brian Must Be Reversed*

The probate court found that, "within the meaning of Probate Code [section 17211, subdivision (a),] Brian and Roger M. contested the Trustee's and co-Trustee's accounts without reasonable cause and in bad faith based on the lack of diligence by Petitioners Brian and Roger [M.] in conducting discovery, their failure to review

proffered discovery, and Brian's mere conjecture that he 'did not believe' many of the entries reported on the account." The court therefore ordered that "the attorney fees awarded by the court to [Roger W.'s and Julie's] attorneys to defend the Petitions filed by [Roger M. and Brian] are to be paid by [Roger M.'s and Brian's] interest in the Pacific Trust." Roger M. and Brian argue that the probate court erred in awarding attorneys' fees against their interests in the Pacific Trust because they had reasonable cause to contest the accountings and did not do so in bad faith.

Section 17211, subdivision (a), provides: "If a beneficiary contests the trustee's account and the court determines that the contest was without reasonable cause and in bad faith, the court may award against the contestant the compensation and costs of the trustee and other expenses and costs of litigation, including attorney's fees, incurred to defend the account. The amount awarded shall be a charge against any interest of the beneficiary in the trust. The contestant shall be personally liable for any amount that remains unsatisfied." Thus, section 17211, subdivision (a), authorizes awarding against a beneficiary the attorneys' fees and litigation expenses incurred to defend an account only if the beneficiary's contest was both "without reasonable cause" and "in bad faith." (Cf. *Uzyel*, *supra*, 188 Cal.App.4th at pp. 926-927 [applying §17211, subd. (b), which authorizes an award of attorneys' fees and litigation expenses in favor of a beneficiary who contests a trustee's account if the trustee's opposition is "without reasonable cause and in bad faith"].)

"Reasonable cause" in this context is synonymous with "probable cause" in the malicious prosecution context, where "'[p]robable cause' to prosecute an action means an objectively reasonable belief that the action is legally tenable." (*Uzyel*, *supra*, 188 Cal.App.4th at p. 926.) "There is no probable cause to prosecute an action only if no reasonable attorney would believe that the action had any merit and any reasonable attorney would agree that the action was totally and completely without merit." (*Ibid.*; see *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 292 ["[t]he question of probable cause is 'whether as an objective matter, the prior action was legally tenable or not'"].) "The probable cause determination is objective and is based on the facts known

44

to the malicious prosecution defendant at the time the action was initiated or prosecuted. [Citation.] Probable cause is a low threshold designed to protect a litigant's right to assert arguable legal claims even if the claims are extremely unlikely to succeed." (*Uzyel*, at pp. 926-927; see *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 817 [standard of probable cause to bring suit is equivalent to that for determining whether an appeal is frivolous].) "If there is no dispute as to what facts were known or if the factual dispute is not material to the probable cause determination, the existence of probable cause is a pure question of law," which we review independently. (*Uzyel*, at p. 927; accord, *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 875.)

In contrast, "bad faith" in this context concerns the beneficiary's subjective state of mind and whether the beneficiary contested the account for an improper purpose. (*Uzyel*, *supra*, 188 Cal.App.4th at p. 926, fn. 47; see *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1263 ["'"[b]ad faith" means simply that the action or tactic is being pursued for an improper motive'"].) "'A subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence,'" which may include a party's conduct before and after the litigation. (*Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, at p. 1263; see *Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 36-37.) Whether a beneficiary contested an account in bad faith is thus a factual question for the probate court's determination in the first instance. (Cf. *Leader v. Cords* (2010) 182 Cal.App.4th 1588, 1600 [applying § 17211, subd. (b)].) We review such a determination for substantial evidence (*Diaz-Barba v. Superior Court* (2015) 236 Cal.App.4th 1470, 1484), unless there are no material factual disputes, in which case we review the determination de novo (*Uzyel*, at p. 927; *Sheldon Appel Co. v. Albert & Oliker*, *supra*, 47 Cal.3d at p. 875).

Whatever evidence may support the probate court's determination that Roger M. and Brian contested the trust accountings in bad faith, they did not contest the trust accountings without reasonable cause because it is not true that "any reasonable attorney would agree that the action was totally and completely without merit." (*Uzyel*, *supra*,

45

188 Cal.App.4th at p. 926.)  Indeed, Roger M. and Brian have achieved some success in the contests, including their correct claim that the MG Trust provides for distributions of portions of the trust principal when each Corman child turned 30, regardless of whether Roger W. and Julie are alive.  Successful contests are not ones that every reasonable attorney would agree are totally and completely without merit.  (See *id.* at p. 928 [trustee's successful opposition to claims showed he had reasonable cause to oppose them]; *Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 383 ["success at trial shows that the suit was not among the least meritorious of meritless suits, those which are totally meritless and thus lack probable cause"].)

Nor was Roger M. and Brian's Pacific Trust contest "totally and completely without merit."  To the contrary, Roger M. and Brian were correct that Roger W. breached his duty of loyalty by withdrawing from the trust the $1.3 million he purportedly deposited in the trust by mistake, plus interest.  And, though we find they failed to establish that Roger W. and Julie breached their duty of loyalty in acquiring the trust's stock in Concorde-New Horizons, a reasonable attorney could have believed that claim had merit and could have pursued that claim.  This is particularly true given the concession by Roger W. and Julie that the transaction was an instance of self-dealing and was not wrongful only if they paid "full and adequate consideration" for the Concorde-New Horizons stock, and that the parties on appeal make reasonable arguments in support of widely divergent figures for the amount Roger W. and Julie paid for the stock.  A reasonable attorney also could have pursued Roger M. and Brian's claim that the trust had an interest in the assets of Pasig.  In the BVI proceeding, for example, Lodise asserted an interest in those assets on behalf of the Pacific Trust up to the time the BVI court issued its judgment in June 2013, approximately one month before trial in this action.  And although Roger M. and Brian's arguments against applying the doctrines of comity and res judicata to the BVI judgment are not meritorious, they are not frivolous.

As reflected in the probate court's relatively brief discussion of it in the court's statement of decision, Roger M. and Brian's contest of the Tessa Trust accounting was substantially less robust than their contest of the Pacific Trust accounting.  One of their

46

claims, however, was that the Tessa Trust held an interest in Pasig's assets. As with their claim that the Pacific Trust held an interest in those assets, a reasonable attorney could have pursued that claim. Thus, Roger M. and Brian's contest of the Tessa Trust's accounting, like their contests of the MG Trust and Pacific Trust accountings, was not without reasonable cause. Therefore, the probate court erred in awarding attorneys' fees against Roger M. and Brian under section 17211, subdivision (a).

## DISPOSITION

The probate court's order ruling that Roger W. did not breach his fiduciary duty as trustee of the Pacific Trust when he withdrew $1,314,642.43 from the trust based on a purported mistake is reversed and remanded for a determination whether Roger W.'s liability for the breach should be excused under Probate Code section 16440, subdivision (b). The probate court's order reforming the MG Trust is reversed with directions to enforce the trust's distribution provisions as originally written. The court's order that Roger M. and Brian are to pay from their shares of the Pacific Trust the attorneys' fees the trustees incurred to defend the petitions and objections is also reversed. In all other respects, the judgment is affirmed. The parties are to bear their costs on appeal.

SEGAL, J.

We concur:

PERLUSS, P. J.

ZELON, J.

47